**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:

NUSSBAUM LOWINGER LLP, *et ano.*,

Debtors.

---------------------------------------------------------------x

**FOR PUBLICATION**

Chapter 11

Case No. 26-22383 (SHL)

(Jointly Administered)

**MEMORANDUM OF DECISION**

**A P P E A R A N C E S:**

**SPENCER FANE LLP**
*Counsel for the Debtors and Debtors-in-Possession*
711 Third Avenue, 17th Floor
New York, New York 10017
By: Jonathan L. Flaxer, Esq.
Michael S. Weinstein, Esq.
Michael S. Devorkin, Esq.
Camber M. Jones, Esq.
Dalma Kovacs, Esq.

**ANDERSON KILL P.C.**
*Counsel for ABCMN LLC*
7 Times Square, 15th Floor
New York, New York 10036
By: Keith A. Lazere, Esq
Ethan Greenberg, Esq.
Jason Kosek, Esq.
Joshua A. Zelen, Esq.
Salvatore A. Salerno, Esq.

**NUTTER MCCLENNEN & FISH, LLP**
*Counsel for Elizabeth Capital Success, LLC*
5 Grand Central East
New York, New York 10017
By: Christopher J. Sullivan, Esq.

**REED SMITH LLP**
*Counsel for Crestview 360 Holdings, LLC*
*and Jacob Sod*
599 Lexington Avenue

New York, New York 10022
By: Richard C. Solow, Esq.

**TARTER KRINSKY & DROGIN LLP**
*Counsel for Joseph Brach*
1350 Broadway, 11th Floor
New York, New York 10018
By: David Wander, Esq.
Jack Manchester, Esq.

**OFFICE OF THE UNITED STATES TRUSTEE**
*United States Trustee, Region 2*
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, New York 10004
By: Tara Tiantian, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion of ABCMN LLC (the "Assignee") to dismiss the bankruptcy cases filed by Nussbaum Lowinger LLP (the "Partnership") and Mark J. Nussbaum and Associates PLLC (the "PLLC" and, together with the Partnership, the "Debtors") and to excuse the Assignee's turnover obligations under 11 U.S.C. § 543(d)(2). *See Motion (1) To Dismiss Voluntary Petitions, and (2) To Excuse Movant's Duty to Deliver Property Pursuant to § 543(d)(2)* [ECF No. 24] ("Motion to Dismiss").[1] The Assignee argues that the Court should abstain from hearing these bankruptcy cases under 11 U.S.C. § 305 in favor of an assignment for the benefit of creditors proceeding filed in New York state court in the summer of 2025. *Id.* The Assignee also argues that dismissal of these bankruptcy cases is appropriate for cause under 11 U.S.C. § 1112 because of the Debtors' bad faith in instituting these proceedings, the Debtors'

[1] Unless otherwise noted, all Case Management/Electronic Case Filing ("ECF") references are to Case No. 26-22383, the lead case in these jointly administered cases. *See Order Pursuant To Fed. R. Bankr. P. 1015(b) Directing Joint Administration of Related Chapter 11 Cases* [ECF No. 15] (directing the joint administration of *In re Mark J. Nussbaum and Associates, PLLC*, Case No. 26-22384 and *In re Nussbaum Lowinger LLP*, Case No. 26-22383 for procedural purposes only).

lack of a legitimate bankruptcy purpose in pursuing these cases, and the Debtors' lack of authority to institute these bankruptcy proceedings. *See generally id.*

The Debtors contend that abstention is not warranted given that, in their view, the New York State assignment for the benefit for creditors proceeding has stalled. *See Objection to ABCMN LLC's Motion To [Sic] (1) To Dismiss Voluntary Petitions, And (2) To Excuse Duty of Assignee to Deliver Property* [ECF No. 51] ("Debtor Opp."). The Debtors also oppose the Assignee's Motion by arguing that the Bankruptcy Court is the best forum to address a case involving an alleged Ponzi scheme. *Id.* Finally, the Debtors disagree that the bankruptcy case was filed in bad faith or that they lacked authority to file. *Id.*

After the Motion to Dismiss was filed, the Office of the United States Trustee ("UST") filed a motion seeking the appointment of a Chapter 11 Trustee. *See United States Trustee's Motion for Order Directing the Appointment of a Chapter 11 Trustee* [ECF No. 45] ("UST Motion"). The UST takes no position on the Assignee's Motion and only seeks a Chapter 11 Trustee if the Motion to Dismiss is denied. The Debtors do not oppose the UST Motion.

Several creditors have filed statements expressing differing views on the Motion and how these cases should proceed. *See Declaration of Christopher J. Sullivan, Esq. in Support of ABCMN LLC's Motion* [ECF No. 35] ("Sullivan Decl.") (affirmation of counsel to creditor Elizabeth Capital Success, LLC supporting dismissal of these bankruptcy cases); *Joseph Brach's (I) Objection to Assignee's Motion (A) To Dismiss Debtors' Chapter 11 Cases, (B) To Excuse Assignee From Turning Over Estate Property, And (C) For Court To Abstain From Adjudicating Bankruptcy Cases; And (II) Joinder To UST's Motion To Appoint Chapter 11 Trustee* [ECF No. 49] ("Brach Opp.") (opposing dismissal of the bankruptcy cases but supporting the appointment of a Chapter 11 Trustee); *Objection of Crestview 360 Holdings, LLC and Jacob Sod to ABCMN*

*LLC'S Motion to Dismiss the Debtors' Voluntary Petitions* [ECF No. 50] ("Crestview Opp.") (same).

For the reasons set forth below, the Motion to Dismiss is granted and the UST Motion is denied as moot.

**BACKGROUND**

Both the PLLC and the Partnership were created by Mark J. Nussbaum to provide legal services, primarily in the area of commercial real estate and related business areas. *See Declaration of Ephraim Diamond in Support of Debtor's Chapter 11 Petition* ¶¶ 11-13 [ECF No. 5] ("Diamond Decl."). The PLLC was formed in 2016 with Mr. Nussbaum as its sole member. *Id.* ¶ 11. The Partnership was formed in 2021 between Mr. Nussbaum and Samuel Lowinger, who had previously worked with Mr. Nussbaum at the PLLC. *Id.* ¶¶ 12-13. After the formation of the Partnership, most or all legal services were conducted through the Partnership, rather than the PLLC. *Id.* ¶ 13.

While the Debtors were formed for the purpose of providing legal services, at a certain point the Debtors began to engage in what the Debtors characterize as other "lines of business," including "hard money lending, liquidity enhancement loans, and short-term bridge loans." *Id.* ¶ 14. According to the Debtors, third parties loaned funds to the Debtors with the expectation that the funds would be lent by the Debtors to third parties while other funds were loaned to the Debtors with the expectation that the funds would remain in Debtors' escrow accounts. *Id.* ¶ 16. The funds for these lending transactions flowed through Debtors' escrow accounts, and the providers of the funds were promised substantial returns for the use of their funds. *Id*. According to the Debtors, these activities ultimately led to these Chapter 11 proceedings because most of the funds in Debtors' escrow accounts were used to support a single client who

ultimately could not repay the funds received, resulting in the depletion of Debtors' escrow accounts. *Id.* ¶ 17. Eventually, the escrow funds were depleted to the point where Debtors lacked sufficient funds to close pending real estate transactions even when the client involved in the transaction had previously escrowed sufficient funds to consummate the transaction. *Id*.

The Assignee characterizes the Debtors' lending activities far less charitably. The Assignee contends that the Debtors were a Ponzi scheme operated by Mr. Nussbaum and a real estate entrepreneur named Mendel Steiner.[2] *See Declaration of Sheldon Eisenberger, Esq. in Support of ABCMN LLC's Motion to Dismiss the Consolidated Petitions and Associated Relief* ¶ 9 [ECF No. 24-2] ("Eisenberger Decl."). The Assignee further contends that Mr. Nussbaum and Mr. Steiner took hundreds of millions of dollars that had been deposited into the Partnership's escrow accounts and funneled those funds to Mr. Nussbaum and Mr. Steiner (and his family) in the guise of investing the funds in real estate transactions. *Id.*

In January 2025, the Debtor ceased all operations after it was revealed that the Debtors held insufficient funds in their escrow accounts. Diamond Decl. ¶ 17; Eisenberger Decl. ¶ 11 (stating that the "scheme began to come to light" after one creditor sued the Partnership and Mr. Nussbaum). Mr. Lowinger withdrew from the Partnership on May 8, 2025. Eisenberger Decl. Ex 7; *see also* Diamond Decl. ¶ 12. In May 2025, Mr. Nussbaum was indicted on a number of felony charges, including grand larceny, and resigned from the practice of law and was subsequently disbarred effective July 9, 2025. Eisenberger Decl. ¶ 11, Exs. 8, 16.

After the Debtors ceased operation, they considered a variety of options to wind down their affairs and ultimately decided to proceed with an assignment for the benefit of creditors under Article 2 of the New York Debtor and Creditor Law. Diamond Decl. ¶ 19; Eisenberger

---

[2] Mr. Steiner died in January 2025. Eisenberger Decl. ¶ 11.

Decl. ¶¶ 12-13. To that end, Mr. Nussbaum, on behalf of the Debtors, executed a General Assignment for the Benefit of Creditors in June 2025 (the "Assignment Agreement"), effecting an assignment to the Assignee, a special purpose entity formed for taking on the assignment. *Id.* ¶ 20; *see also* Eisenberger Decl. Ex. 9. In August 2025, the New York State Court granted the Assignee's petition and commenced the assignment for the benefit of creditors proceeding (the "ABC Proceeding"). Eisenberger Decl. Ex. 11.

Some eight months later, the Debtors commenced these bankruptcy cases on April 16, 2026. *See Voluntary Petition* [ECF No. 1]. According to the Debtors, the ABC Proceeding has "stalled," making minimal progress towards effectuating asset recoveries or making distributions to creditors while the Debtors continued to be faced with a multitude of litigation. Diamond Decl. ¶¶ 21-23. This purported delay, combined with the drain on the Debtors' resources caused by the ongoing litigation, prompted the Debtors to reconsider how to best wind down their affairs with the Debtors now deciding to file these bankruptcy cases. *Id.* ¶¶ 23-24. On April 20, 2026—four days after the Debtors commenced these cases—the Debtors' Chief Restructuring Officer, Ephraim Diamond, sent a notice to the Assignee purporting to terminate the Assignment Agreement dated June 16, 2025. *See* Eisenberger Decl. Ex. 25.

In moving to dismiss these bankruptcy cases, the Assignee strongly disputes the Debtors' characterization of the ABC Proceeding as stalled, and provides extensive details about the activities of the Assignee in the ABC Proceeding. The Assignee argues that abstention is warranted given the existence of the ABC Proceeding and the progress made in that proceeding. *See generally Memorandum of Law in Support of ABCMN LLC's Motion to (1) Dismiss Voluntary Petitions, and (2) Excuse Duty of Assignee to Deliver Property* [ECF 24-1] ("Assignee Mem."). The Assignee also contends that these bankruptcy cases are an abuse of process and

should be properly understood as part of Mr. Nussbaum's continued attempt to defraud his creditors. *Id.* The Assignee also notes that, under Section 543(d)(2) of the Bankruptcy Code, the Assignee does not have a duty to turnover any of the Debtors' property held by the Assignee because the ABC Proceeding has been pending more than 120 days. *Id.*

The UST takes no position on the Motion to Dismiss. But it argues that, if the case is not dismissed, it is necessary to appoint an independent fiduciary to conduct these bankruptcy cases. Hr'g Tr. 92:3-93:6 (May 29, 2026) [ECF No. 62]; *see also* UST Motion at 1-2. The UST argues that cause exists to appoint a Chapter 11 Trustee because Mr. Nussbaum cannot fulfill the fiduciary duties of a debtor in possession given his admitted scheme to defraud creditors. UST Motion at 1. Even though the Debtors appointed Mr. Diamond as the Chief Restructuring Officer, the UST contends that Mr. Diamond's appointment does not establish the existence of an independent fiduciary as Mr. Diamond was appointed by Mr. Nussbaum and would have to report to Mr. Nussbaum as the Debtors sole governing principal, while also having to investigate Mr. Nussbaum's conduct. *Id.* at 1-2. Moreover, Mr. Diamond is not disinterested in the UST's eyes, as Mr. Diamond has a familial relationship with Samuel Lowinger, Mr. Nussbaum's former law partner. *Id.* at 2.

The Court held hearings on the Motion to Dismiss and the UST Motion on May 29, 2026, and June 11, 2026. *See* Hr'g Tr. (May 29, 2026); *See* Notice of Adjournment of Hearing [ECF No. 52]. All parties, including the Debtors, agreed that if the cases remain in the Bankruptcy Court, the appointment of a Chapter 11 Trustee was warranted. *See Debtors' Statement of No Objection Regarding Motion to Appoint Chapter 11 Trustee* [ECF No. 58]; Sullivan Decl.; Brach Opp.; Crestview Opp.; *ABCMN LLC'S Response to United States Trustee's Motion for Appointment of Chapter 11 Trustee* [ECF No. 55] (agreeing that "Mr. Diamond should *not* serve

as [chief restructuring officer]" and asserting that the UST Motion provides additional basis for dismissal) (emphasis in original).

## DISCUSSION

### I. Abstention

Given the existence of the ABC Proceeding in the New York state court, the Court begins with the Assignee's request for abstention under Section 305 of the Bankruptcy Code. Section 305 provides that "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1). Abstention is "an extraordinary remedy," and dismissing a case is appropriate under Section 305(a)(1) "only in the situation where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal." *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008) (quoting *In re Eastman*, 188 B.R. 621, 624 (9th Cir. BAP 1995)). The moving party bears the burden of demonstrating that dismissal or suspension of the proceedings would benefit both the debtor and its creditors. *Id.* at 462-63. When determining whether to abstain and dismiss a court must engage in a "fact-intensive inquiry that entails consideration of the totality of the circumstances." *In re Wythe Berry Fee Owner LLC*, 2023 WL 1786407, at *6 (Bankr. S.D.N.Y. Feb. 6, 2023) (citing *Monitor Single Lift I*, 381 B.R. at 464). Courts consider the following seven factors when evaluating whether dismissal or suspension of a bankruptcy proceeding under Section 305:

(1) economy and efficiency of administration;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) whether federal proceedings are necessary to reach a just and equitable solution;

> (4) whether there is an alternative means of achieving an equitable distribution of assets;
>
> (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
>
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
>
> (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002) (citing *In re 801 South Wells Street, L.P.*, 192 B.R. 718, 723 (Bankr. N.D.Ill. 1996)). While a court should consider all factors, "not all [factors] are given equal weight in every case." *Monitor Single Lift I, Ltd.*, 381 B.R. at 465.

These factors overwhelmingly support abstention here. As for factors two and four, there is another forum available to protect the interest of the parties and achieve an equitable distribution of assets given the existence of the ABC proceeding. *See Compagnia Distribuzione Calzature, S.R.L. v. PSF Shoes Ltd.*, 206 A.D.2d 343, 344 (App. Div. 2d Dep't 1994) ("A general assignment for the benefit of creditors is an assignment by a debtor transferring all of his or her property in general terms to an assignee in trust for all creditors of the debtor, or a voluntary transfer by a debtor of all his property to a trustee of his own selection, for administration, liquidation, and equitable distribution among his creditors.") (internal citations omitted); *see also In re Gen. Assignment for the Benefit of Creditors of Peter Puppet Playthings, Inc.*, 10 A.D.2d 866, 866 (App. Div. 2d Dep't 1960) ("an assignment for the benefit of creditors is a voluntary liquidation, desired by the assignor.") (internal citations and quotations omitted). As for factors one, three and six, the ABC Proceeding have made considerable progress while pending in state court for nearly a year and starting anew in bankruptcy court now would costly and inefficient.

The Debtors argue that the ABC Proceeding has "stalled" and that these bankruptcy cases are a much better choice for addressing the rights of creditors in these cases given the Ponzi scheme allegations. *See* Diamond Decl. ¶¶ 21-22, 24 (asserting "there has been minimal progress made in effecting recoveries or making distributions to creditors" and that such lack of progress caused the Debtors to "reconsider[] how to most efficiently wind down their affairs."); Debtor Opp. ¶¶ 112, 115 (Debtors asserting that the Bankruptcy Court is "exceptionally familiar with Ponzi schemes" and has a "well-developed jurisprudence" that will enable the Debtors to resolve matters much more efficiently and in a manner that avoids contrary and inconsistent rulings). While there is no doubt that the Bankruptcy Code is well equipped to handle Ponzi scheme cases, *see, e.g. Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd,* 654 F.3d 229 (2d Cir. 2011), this fact does not end the abstention inquiry. That inquiry requires the Court to examine the facts of these cases using the relevant factors in Section 305 and assessing the status of the pending ABC Proceeding.

The Debtors' claim that the ABC Proceeding has made little progress and has "stalled." But the Debtors' contention is flatly belied by the record. In just a year, the Assignee has taken the following significant steps:

- established a bar date so that the Assignee can determine the universe of creditors to whom the Debtors may owe money;
- engaged in extensive investigation of the Debtors' businesses, including by taking depositions;
- instituted multiple lawsuits, including litigation against the estate of Mendel Steiner, Mr. Nussbaum's co-conspirator;
- negotiated settlements in excess of $16 million; and
- obtained default judgments in excess of $300 million.

*See* Eisenberger Decl, Ex. 10 (Verified Claim asserted by the Assignee against the Estate of Mendel Steiner); Ex. 12 (partial transcript of deposition of Mark J. Nussbaum); Ex.14 (Complaint filed in the matter of ABCMN LLC v. Real Green Management Corp., Index No. 656436/2025 (Supreme Court, New York County)); Ex. 20 (Amended Complaint filed in the matter of ABCMN LLC v. DS Lending LLC, Index No. 650810/2026 (Supreme Court, New York County)); Ex. 23 (Decision of the Hon. Gerald Lebovits granting a Default Judgment in favor of the Assignee filed in the matter of ABCMN LLC v. Real Green Management Corp., Index No. 656436/2025 (Supreme Court, New York County)). In short, the Debtors' contention that the ABC Proceeding has "stalled" is a conclusory label that lacks evidentiary support. Given the substantial progress, a Chapter 11 Trustee in these bankruptcy cases would be required to play a significant amount of "catch-up," with any Chapter 11 Trustee needing to become familiar with the history of the Debtors and their transactions. Bringing in a Chapter 11 Trustee now who is a stranger to these cases would mean that the Trustee would have to expend an enormous amount of time—not to mention money—simply to get to the level of knowledge that the Assignee already possesses. Similarly, any Chapter 11 Trustee would need to step into the shoes of the Assignee as to any pending litigation and settlement discussions, a substantial challenge.

The Court's conclusion on abstention today is bolstered by both the legislative history of Section 305 and the relevant case law. In drafting Section 305, Congress noted that "[t]he court may dismiss or suspend under [Section 305(a)], for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment." *In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 247 (B.A.P. 9th Cir. 2007) (quoting H.R.Rep. No. 95–595 at 325 (1977)); *see also* 2 Collier

on Bankruptcy ¶ 305.02 (16th ed. 2026). Not surprisingly, courts have consistently dismissed bankruptcy cases in favor of assignment for the benefit of creditor proceedings where the assignee has already made significant progress towards resolving the obligations. For example, the court in *In re Korean Radio Broadcasting Co*., 2020 WL 2047990 (Bankr. E.D.N.Y. March 31, 2020) dismissed an involuntary bankruptcy proceeding, finding, *inter alia*, that the petitioning creditor failed to present "evidence that shows—or even suggests—that the ABC Proceeding is somehow inadequate, or the Assignee is somehow compromised, in fulfilling their roles" and that dismissal was warranted because "there is presently no trustee in place, no professionals have yet been retained, and no agreement that assures a minimum recovery has been entered into." *In re Korean Radio Broadcasting Co.*, 2020 WL 2047990 at *10-*11. Similarly, the Seventh Circuit in *Bailey's Beauticians* affirmed the decision of a bankruptcy court to dismiss a bankruptcy in favor of an assignment for the benefit of creditors proceeding in state court because the creditors would benefit from the assignee's continued administration of the estate given that the assignee had already reduced the amount of secured debt, monetized assets, and entered into settlement agreements. *In re Bailey's Beauticians Supply Co.*, 671 F.2d 1063, 1067 (7th Cir. 1982). In reaching that conclusion, the *Bailey's Beauticians* court noted that the assignee's administration of the assignment proceeding was "more than satisfactory to those creditors who together held over ninety percent of the claims" against the debtor. *Id.* So too, here, the Debtors' largest creditor, Elizabeth Capital Success LLC, supports dismissal of these cases in favor of the ABC Proceeding. *See* Sullivan Decl. In the same vein, courts have dismissed proceedings initiated in federal court after the commencement of a state court assignment for the benefit of creditors proceeding even where the federal case had been initiated due to the obligor's "dissatisf[action] with proceedings in the New York courts," with the federal

court being "disinclined to interfere with the orderly administration of the assignment in the New York courts." *Faber Cement Block Co. v. Pauless Realty Corp.*, 425 F.2d 223, 224 (2d Cir. 1970) (per curiam).

Crestview 360 Holdings, LLC and Joseph Brach, the two creditors who oppose the Motion to Dismiss (albeit while advocating for the appointment of a Chapter 11 trustee) both point to *In re Nogin Com. LLC*, 670 B.R. 711 (Bankr. S.D.N.Y. 2025), a recent decision from this district where the court declined to abstain in favor of a pending assignment for the benefit of creditors proceeding pending in state court. *See* Brach Opp. ¶ 50; Crestwood Opp. ¶ 14. But that case is easily distinguishable. On the one hand, it is true that the *Nogin* court found that abstention was not warranted, noting that "the [Bankruptcy] Court can offer an efficient means for addressing the claims of the Alleged Debtor's estate (factor 1) in a just and equitable fashion (factor 3) . . . . Moreover, while the Assignment Proceeding is already pending in state court and can offer an alternative means of distribution of assets, it is unclear that the Assignee has sufficiently accounted for the interests of all creditors to do so in an equitable manner." *Nogin,* 670 B.R. at 733; *id.* at 731, n. 9 (noting that "a bankruptcy proceeding can provide benefits that are unavailable under New York state law."). But on the other hand, the facts in *Nogin* were far different. Less than a month passed in *Nogin* between the execution of the assignment agreement and the filing of the bankruptcy petition. *See id.* at 717-18 (noting that the assignment agreement was accepted by the assignee on March 31, 2025 and the petition was filed on April 24, 2025). Indeed, no assignment proceeding had officially been commenced because the state court had not yet ruled on the relevant motion. *Id.* at 717 (noting that the hearing on the order to show cause regarding the commencement of the assignment proceeding was scheduled for a hearing on May 20, 2025, almost a month after the bankruptcy petition was filed). So when

declining to abstain, the *Nogin* court highlighted that "nothing substantial has occurred in the Assignment Proceeding to date[;]" and that it "is not the case that the [a]ssignment [p]roceeding has gone so far that it would be costly and time consuming to 'start afresh' here." *Id.* at 733. By contrast here, the Assignment Agreement was nearly ten months old when these bankruptcy cases were filed, and the ABC Proceeding was formally commenced in the state court more than eight months ago. Moreover, the Assignee has made significant progress in both his investigation and the pursuit of litigation. Under these circumstances, any potential advantages of a bankruptcy proceeding are insufficient to overcome the large loss of time and money that would result from starting from scratch in a new forum.[3]

The Court's conclusion on abstention today is also bolstered by the Bankruptcy Code's provision that normally excuses the obligation to turn over estate property to a debtor where an assignment for the benefit of creditors has been in place for more than 120 days before the bankruptcy was filed. That provision states in relevant part that

> [a]fter notice and hearing, the bankruptcy court shall excuse compliance with subsections (a) and (b)(1) of this section if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, unless compliance with such subsections is necessary to prevent fraud or injustice.

11 U.S.C. § 543(d)(2). The Assignee here was formally appointed by the state court on August 26, 2025, *see* Eisenberger Decl. Ex. 11, almost eight months before these bankruptcy cases were filed. Thus, Section 543(d)(2) directs that the Assignee is relieved of its obligation to turn over the Debtors' assets that the Assignee holds, unless this Court makes a finding of fraud or injustice. But the Court has no basis to make such a finding on this record. Without such a

[3] Indeed, the Debtors' decision to "change horses" now at the direction of Mr. Nussbaum raises significant questions, as will be discussed in greater detail below.

finding, the Assignee has no turnover obligation and there are no assets for the Court to administer in the bankruptcy cases.[4]

Seeking to overcome the plain meaning of the statute, the Debtors argue that the Assignment Agreement here was terminated. *See* Debtor Opp. ¶¶ 68-75. To support this argument, the Debtors point to a purported reservation in the Assignment Agreement, which states that "[i]n the event [Debtors] become[] a debtor in any bankruptcy proceeding, which the [Debtors] expressly retain[] the right to cause by filing of a bankruptcy Petition, the [Debtors] shall have the option to terminate this Assignment (in addition to any termination that shall be effectuated by operation of law)." *See* Eisenberger Decl. Ex. 9 ¶ 16. According to the Debtors, this language means that the Assignment Agreement is terminable at will by the Debtors and the Debtors were permitted to terminate the Assignment Agreement on April 20, 2026. *See* Eisenberger Decl. Ex 25 (Letter from Mr. Diamond to the Assignee that the Debtors were terminating the Assignment Agreement); *see also* Debtor Opp. ¶¶ 72-75 (arguing that the Debtors retained the right to initiate bankruptcy proceedings and to terminate the Assignment). According to the Debtors, therefore, there is no longer an assignee here for the purposes of Section 543 and any property already collected by the Assignee must be turned over. *See* Debtor Opp. ¶¶ 67-82.

But this argument suffers from several fatal flaws. As a threshold matter, the Debtors' purported termination of the Assignment Agreement has the effect of unilaterally vacating the order of the state court that appointed the Assignee—a proposition for which, unsurprisingly, the

[4] While the Debtors make passing reference in its opposition to the language at the end of the clause that provides that turnover may still be required when "necessary to prevent fraud or injustice," Debtor Opp. ¶ 80 (quoting 11 U.S.C. § 543(d)(2) without discussion), the Debtors do not offer any explanation of any fraud or injustice that would justify the exception contained in Section 543(d)(2). To the contrary, requiring the turnover of assets to the Debtors would appear to only serve to delay any distribution to creditors, seemingly to the detriment of everyone except Mr. Nussbaum.

Debtors offer no legal support. Indeed, there does not appear to be any. "It is clear law that such an assignment, if assented to by the creditors, or a considerable portion of them, becomes irrevocable." *Barings v. Dabney*, 86 U.S. 1, 9 (1873). Not surprisingly then, the transfer of assets to an assignee under New York State law cannot be undone absent a court order. *See In re Super. Kitchen Prods. Corp.*, 44 F. Supp. 807, 809 (E.D.N.Y. 1942) *aff'd sub nom. Florence Trading Corp v. Rosenberg*, 128 F.2d 557 (2d Cir. 1942) ("The property of the bankrupt in the possession of the assignee prior to the filing of the petition in bankruptcy was *in custodia legis* and could not be taken from that custody without the consent of the State Court being first obtained.") (internal citations omitted); *see also M. Mirzoeff, Inc. v. Foster & Chadwick Fur Co.,* 36 Misc. 2d 860, 861 (Sup. Ct.N.Y. Cty. 1962) (same).[5] To the extent that the Debtors rely on the reservation in the Assignment Agreement, it is well settled that "[i]t would defeat the purpose of the [Bankruptcy] Code to allow parties to provide by contract that the provisions of the [Bankruptcy] Code should not apply." *In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 263 (Bankr. D. Del. 2016) (quoting *n re 203 N. LaSalle St. P'ship*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000)). Thus, the purported contractual right to terminate the Assignment Agreement cannot override the plain language of Section 543(d)(2) that provides that a bankruptcy court "*shall* excuse compliance" with the requirement to turn over assets. 11 U.S.C. § 543(d)(2) (emphasis added); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26,

[5] In *City of New York v. United States*, 283 F.2d 829 (2d Cir. 1960), the Second Circuit held that taxing authorities could not lien assets to secure tax obligations incurred by the debtor because the debtor had executed an assignment for the benefit of creditors prior to the taxing authorities seeking to lien that property. The Second Circuit concluded that the taxing authorities could not lien the debtor's property because once the debtor executed the assignment for the benefit of creditors, the assignee took title to the debtor's estate, which is held *in custodia legis*. *City of New York,* 283 F.2d at 831 (internal citations omitted). As the only property the debtor retained after the assignment was the "right to have refunded to him whatever remains after the creditors have been satisfied," the debtor had no property to which liens could attach. *Id.* at 832; *see also In re Superior Kitchen Prods. Corp*., 44 F. Supp. at 809 (once an assignee takes custody of the debtor's property, the property "could not be taken from that custody without the consent of the State Court being first obtained.") (internal citation omitted).

35 (1998) (the word "shall" is "mandatory" which "normally creates an obligation impervious to judicial discretion"). This leaves no assets for the Bankruptcy Court to administer in these cases.

Moreover, the Debtors did not purport to terminate the Assignment Agreement until April 20, 2026—four days *after* these bankruptcy cases were filed. *See* Eisenberger Decl. Ex. 25, *see also* ECF No. 1. Thus, the Assignment Agreement was still effective at the time the bankruptcy estates were created in these cases. And given that sequence of events, the Debtors' purported termination is invalid because it was done without this Court's approval. More specifically, the Debtors' purported termination of the Assignment Agreement was unquestionably an action outside the ordinary course of business and, accordingly, required approval from the Court to become effective. Under Section 363 a debtor in possession may "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing" but transactions "other than in the ordinary course of business" require notice, a hearing, and court approval. 11 U.S.C. § 363(b)(1), (c)(1). Courts must engage in a "peculiarly factual analysis" to determine whether a transaction was in the ordinary course of business. *Faleck & Margolies, Inc. v. Vardi Stonehouse, Inc.* 153 B.R. 123, 125 (Bankr. S.D.N.Y. 1993) (internal citations and quotations omitted). The provisions of Section 363 were "designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *In re Leslie Fay Companies, Inc*., 168 B.R. 294, 301 (Bankr. S.D.N.Y. 1994) (quoting *In re Roth Am., Inc*., 975 F.2d 949, 952 (3d Cir. 1992)).

It is hard to conceive of the Debtors' purported termination of the Assignment Agreement as being in the "ordinary course of business." The term "ordinary course of business" includes "the reasonable expectations of interested parties of the nature of transactions that the debtor

would likely enter in the course of its normal, daily business." *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 384 (2d Cir. 1997) (quoting *In re Watford*, 159 B.R. 597, 599 (M.D. Ga. 1993)). To determine whether a transaction is ordinary courts apply two tests: "the 'creditor's expectation test' also known as the 'vertical test,' and . . . the 'industry-wide test' also called the 'horizontal test.'" *Id.* (quoting *Roth Am., Inc.*, 975 F.2d at 952-53). The transaction must satisfy both tests. *In re Crystal Apparel, Inc.*, 220 B.R. 816, 831 (Bankr. S.D.N.Y. 1998).

Under the vertical test, the court "views the transaction as a hypothetical creditor and asks whether the transaction subjects a creditor to different economic risks than those when he decided to enter into a contract with the debtor." *Lavigne*, 114 F.3d at 385 (internal citations and quotations omitted). Under the horizontal test, courts adopt "an industry-wide perspective in which the debtor's business is compared to other like businesses. In this comparison, the test is whether the post-petition transaction is of a type that other similar businesses would engage in as ordinary business." *Id.* (quoting *In re Dant & Russell, Inc.*, 853 F.2d 700, 704 (9th Cir. 1988)); *In re Drexel Burnham Lambert Group, Inc.*, 157 B.R. 532, 537 (S.D.N.Y. 1993).

Under both the horizontal test and the vertical test, the Debtors' purported decision to terminate the Assignment Agreement was not part of the Debtors' ordinary course of business. As a threshold matter, the Debtors did not have an "ordinary course of business" as they had ceased operations entirely at the time these petitions were filed. Diamond Decl. ¶ 17. Viewing the decision to terminate the Assignment Agreement under the vertical test from the perspective of a hypothetical creditor, it is clear that the decision to terminate the Assignment Proceeding after nearly a year would subject creditors to economic risks in the form of significantly increased delays and an attendant increase in costs, thus reducing the assets available to

distributions to creditors and depriving creditors of those assets for longer periods of time. *See* Sullivan Decl. ¶¶ 3, 15 ("By interfering in the ongoing litigations filed by the . . . Assignee, the Debtors are effectively minimizing the value that may be recovered by creditors."). Nor is the decision to terminate the Assignment Agreement the type of transaction that other similar businesses would engage in as ordinary business under the horizontal test.[6]

## II. Bad Faith

The Court turns now to the Assignee's request that these bankruptcy cases be dismissed "for cause" under 11 U.S.C. § 1112(b). A party seeking dismissal has the burden of producing evidence to demonstrate that cause exists; if that burden is met, the debtor must then show that relief is not warranted. *See In re RCM Glob. Long Term Cap. Appreciation Fund, Ltd.*, 200 B.R. 514, 519 (Bankr. S.D.N.Y. 1996), *corrected* (Sept. 18, 1996). Section 1112(b) lists sixteen factors that constitute cause, including, among others, "gross mismanagement of the estate" and "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b). However, this list is "illustrative, not exhaustive." *C-TC 9th Ave. P'ship v. Norton Co.*, (*In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997). While not explicitly enumerated in the statute, "[i]t is well settled that a finding that a case was filed in bad faith can constitute 'cause' for dismissal under section 1112(b)(1)." *In re AAGS Holdings LLC*, 608 B.R. 373, 382 (Bankr. S.D.N.Y. 2019) (internal citations omitted).

"The 'good faith' requirement for Chapter 11 petitioners has strong roots in equity . . . . A debtor who attempts to garner shelter under the Bankruptcy Code, therefore, must act in conformity with the Code's underlying principles" of "avoidance of the consequences of

---

6 For all these same reasons, the Court will grant the Assignee's request to excuse turnover.

economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected." *In re SGL Carbon Corp.*, 200 F.3d 154, 161 (3d Cir. 1999) (internal citations omitted). "The 'critical test' of a debtor's bad faith focuses on the debtor's petition date and asks two questions: (i) whether there was 'no reasonable likelihood that the debtor intended to reorganize' (the 'subjective bad faith' prong); and (ii) whether there was 'no reasonable possibility that the debtor will emerge from bankruptcy' (the 'objective futility' prong)." *In re JJ Arch LLC.*, 663 B.R. 258, 281 (Bankr. S.D.N.Y. 2024), *motion for relief from judgment denied sub nom. In re JJ Arch LLC*, 676 B.R. 675 (Bankr. S.D.N.Y. 2025) (quoting *In re Hudson 888 Owner LLC*, 2024 WL 1145664, at *4 (Bankr. S.D.N.Y. Mar. 15, 2024)). Bad faith may be found where "at the time of filing, there is no reasonable probability of emerging from bankruptcy or successfully reorganizing, or where there is evidence of an intent to delay or frustrate the efforts of secured creditors to enforce their legitimate rights." *In re Froman*, 566 B.R. 641, 647 (S.D.N.Y. 2017) (internal citations and quotations omitted).

When assessing whether a case was filed in bad faith, courts look to the following factors:

(1) the debtor has only one asset;

(2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8) the debtor has no employees.

*In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311 (citing *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828 (W.D.Ky.1992)). However, such factors are not to be applied "mechanically" and "an inquiry into whether a petition was filed in bad faith requires the court to consider the entire view of the facts and circumstances" with no one factor being determinative. *In re AAGS Holdings LLC*, 608 B.R. at 383 (internal citations omitted). In assessing whether bad faith exists, "courts examine 'the totality of the circumstances,' focusing on whether the filing reflects 'an intent to abuse the judicial process' or 'the purpose of the reorganization process.'" *In re SPAC Recovery Co.*, 676 B.R. 708, 717 (Bankr. S.D.N.Y. 2026) (quoting *Clear Blue Water, LLC v. Oyster Bay Mgmt. Co., LLC*, 476 B.R. 60, 68 (E.D.N.Y. 2012)).

Applying all of these principles to these bankruptcy cases, the Court concludes that there is cause for dismissal. Examining "the totality of the circumstances," the Court concludes that these cases reflect "an intent to abuse the judicial process" rather than a true "reorganization process." *In re SPAC Recovery Co.*, 676 B.R. at 717 (internal citations and quotations omitted).

To be sure, certain factors that weigh in favor of dismissal are not present here. The Debtors possess more than one asset, the creditor body is composed entirely of unsecured creditors, and this is not a two party dispute. *See, e.g.,* Diamond Decl. ¶ 27, Ex. A. But on balance, the totality of relevant facts weigh strongly in favor of dismissal. It is undisputed that the Debtors are not operating. Diamond Decl. ¶ 17. Accordingly, the Debtors have little or no cash flow, cannot meet expenses, and have no employees—in other words, there is no "reasonable likelihood that the [D]ebtor intended to reorganize" and there is no "reasonable

possibility that the debtor will emerge from bankruptcy." *In re Loco Realty Corp*., 2009 WL 2883050, at *3 (Bankr. S.D.N.Y. June 25, 2009) (internal citation omitted). These bankruptcy cases were filed solely to "efficiently wind down [the Debtors'] affairs." Diamond Decl. ¶ 24. But it is unclear if the Debtors have any assets to distribute to creditors in these bankruptcy cases given, as discussed above, that the Assignee took title to all of the Debtors' assets and is excused from turning over those assets under Section 543(d)(2). Moreover, the Debtors were already efficiently winding down their affairs through the ABC Proceeding, a process started with the support of Mr. Nussbaum that has only recently been withdrawn.

The facts here raise concern about the true purpose of these cases. Of particular relevance, the Assignee notes that, the Debtors filed these bankruptcy proceedings only after the Assignee had filed a lawsuit alleging Mr. Nussbaum's personal attorney was assisting Mr. Nussbaum in diverting assets that should have been turned over to the Assignee. *See* Assignee Mem. at 10. The Assignee only discontinued the lawsuit after the attorney's firm intervened and asked for the lawsuit to be dismissed without prejudice in order to allow the attorney and Mr. Nussbaum to address the issues raised and provide additional materials sought by the Assignee. *Id.* at 10. But instead of taking the promised remedial steps, the Debtors commenced these cases. *Id.* at 10-11. Thus, the Assignee argues that the "true purpose of these Petitions is . . . to frustrate the Assignee's efforts to hold Nussbaum and Nussbaum's attorney to account for diverting assets that rightfully should go to the Assignee for ultimate distribution to the creditors, and to wrest control from the Assignee in favor of a potentially biased Chief Restructuring Officer, Mr. Diamond." Assignee Mem. at 16. The Court finds the Assignee's view to be persuasive given the entire factual record here. The Court historically looks with skepticism upon efforts to change venue in such circumstances. In *In re JJ Arch LLC,* the Court found that

the debtor had engaged in forum shopping, with the bankruptcy being a "means of removing" state court proceedings from the purview of a state court judge who had repeatedly ruled against the debtor. *JJ Arch*, 663 B.R. at 282. Here, too, these bankruptcy cases appear to be motivated by Mr. Nussbaum's desire to restart the process, with no plausible rationale other than to delay the discovery of additional assets.

The Debtors' conduct in the early stages of these bankruptcies also contributes to a finding of bad faith. *See JJ Arch*, 663 B.R. at 283. Most significantly, the Debtors terminated the Assignment Agreement after instituting these proceedings unilaterally without seeking leave from either this Court or from the state court where the ABC Proceeding is pending. The Debtors' choice to act unilaterally under these circumstances—rather than seek such relief on notice to creditors—undermines the Debtors' contention that these bankruptcies were filed in good faith to serve creditors' interests. Finally, the Court is troubled by the Debtors' initial intention to proceed with these cases with Mr. Nussbaum's handpicked CRO Mr. Diamond, notwithstanding that Mr. Diamond's familial ties to Mr. Nussbaum's partner.[7] As Mr.

[7] The Assignee also challenges Mr. Nussbaum's authority to appoint Mr. Diamond, arguing that professional corporations and partnerships require at least one member who is a professional authorized by law to practice that profession to make decisions on the entity's behalf. *See* N.Y. Lmt. Liab. Co. § 1207 ("A member of a professional service limited liability company shall be only a professional . . . authorized by law to practice in this state a profession that such limited liability company is authorized to practice and who is or has been engaged in the practice of such profession in such limited liability company or a predecessor entity."); *see also* N.Y. P'ship Law § 121-1500(a)(I) (requiring that at least one of the partners in a partnership be "a professional authorized by law to render a professional service within this state"). As Mr. Nussbaum was disbarred and no longer licensed to practice the profession for which the PLLC and Partnership were formed, the Assignee contends that he had no authority to make any decisions on behalf of the Debtors and no power of management over the Debtors. *See* ABCMN LLC'S Reply Memorandum of Law In Support of its Motion (1) To Dismiss Voluntary Petitions, and (2) To Excuse Duty of Assignee to Deliver Property at 3-5 [ECF No. 56]. But it is well established that both partnerships and corporations may take action to wind up the entity's affairs even after dissolution. "A dissolved corporation, its directors, officers and shareholders may continue to function for the purpose of winding up the affairs of the corporation in the same manner as if the dissolution had not taken place," N.Y. Bus. Corp. Law § 1006(a). Similarly, a dissolved partnership does not terminate, but "continues until the winding up of partnership affairs is completed." N.Y. P'ship Law § 61. At least one New York state court has found that even if the sole member of a company has been disqualified from the practice of the profession for which the entity was formed, that member may still wind up the affairs of the corporate entity. *See A.B. Med. Servs., PLLC v. Travelers Indem*. Co., 26 Misc. 3d 69, 72 (App. Term 2d Dep't 2009) ("[W]here, as here, the disqualified member was the sole member of such company, he may wind up the

Nussbaum's criminal conduct precipitated the Debtors' need to cease operations, it is problematic for him to dictate how best to compensate creditors, particularly in light of the significant progress the Assignee had already made in the ABC Proceeding. Assignee Mem. at 16; Eisenberger Decl. Ex. 21.[8]

## CONCLUSION

For the forgoing reasons, the Assignee's Motion to Dismiss is granted, and the UST Motion is denied as moot. The Assignee should settle an order on five days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon counsel for the Debtors and the UST.

Dated: White Plains, New York
August 14, 2026

***/s/ Sean H. Lane***
UNITED STATES BANKRUPTCY JUDGE

---

professional service limited liability company's affairs by, among other things, prosecuting and/or defending an action on behalf of the professional service limited liability company.").

[8] The Assignee also argues that the Debtors are not authorized to proceed with these cases because the Partnership is not "person" eligible to be a debtor because the Partnership is dissolved and therefore without the legal authority to continue in business. *See* Assignee Mem. at 26-28. Case law in this district differs on whether a dissolved partnership is eligible to liquidate in a Chapter 11 proceeding. *Compare In re Hagerstown Fiber Ltd. P'ship*, 226 B.R. 353, 358 (Bankr. S.D.N.Y. 1998) ("*C–TC* established a bright line test for chapter 11 eligibility without regard to rehabilitation or liquidation. In either case, the debtor must have the legal 'option' to continue in business."); *with In re Shea & Gould*, 214 B.R. 739, 745-46 (Bankr. S.D.N.Y. 1997) (noting that the *C-TC* debtor stated an intention to reorganize, a factual distinction from the case at bar, and noting that the Bankruptcy Code explicitly permits a partnership to be a Chapter 11 debtor and permits liquidation in a Chapter 11 proceeding). In light of the Court's conclusions as to abstention under Section 305 and dismissal for cause under Section 1112, the Court today need not address this thorny area of law.